FLORA B. MILLER, et al. v. VIRGIE FORD, by Next Friend.

Eastern Section. November 28, 1925.

Certiorari denied by Supreme Court March 6, 1926.

1. **Wills. Nuncupative wills. Statute rigidly construed in regard to nuncupative wills.**
It is the policy of this State to construe the provisions of our statute in regard to nuncupative wills rigidly and strictly. It must appear that all requirements of the statute have been complied with. The making of a nuncupative will is required to be proven by evidence more strict and stringent in every particular than the making of a written will.

2. **Wills. Nuncupative wills. Purported nuncupative will made in hospital held not to comply with statute and void.**
In an action to establish a purported nuncupative will where deceased became ill in his home and was removed to hospital where will was attempted to be made, held that a person who is suffering from his last illness in his home and from there removed to a hospital is not within the terms of the statute requiring will to be made in his home. He could make a disposition of his property only by formal will duly executed.

3. **Wills. Nuncupative wills. Instructions taken down by attorney from which to draw a will can not be admitted as nuncupative will.**
Where an attorney was called to a hospital and took down notes and instructions for drawing a will but will was not executed, held not to be admissible as nuncupative will.

4. **Wills. Nuncupative wills. Testamentary words must be reduced to writing in statutory period and submitted to all the witnesses.**
Where the words and instructions of deceased were taken down by attorney and reduced to writing within statutory period but not submitted to other witnesses for over six months held void as nuncupative will for statute contemplates that all the witnesses shall see will as written within statutory period.

5. **Wills. Nuncupative. Evidence held not to establish nuncupative will.**
Where deceased was sick and removed to a hospital and there gave instructions to an attorney to draw a will which instructions were reduced to writing at the time but not shown to other witnesses for over six months, held not admissible as a nuncupative will.

Error to Circuit Court, Washington County; Hon. D. A. Vines, Judge.

Reversed and remanded with instructions.

Miller and Winston, of Johnson City, for plaintiff in error.

Barnes and Hensley, of Johnson City, for defendant in error.

PORTRUM, J.   The controversy in this case arises over the purported nuncupative will of E. M. Russell, deceased; and a trial was had in the circuit court of Washington county on the issue of devisavit vel non.   The proponents were successful in the lower court and the contestants have appealed.   The amount of personal property involved is $2,000.

The deceased, R. M. Russell, was a federal soldier in the war between the States, commanding as captain a company of New York negro troops.   He was a man of fine physique, intelligent and of high integrity; he had no immediate family and spent the greater part of his life since the war as an officer in the federal soldiers' homes, coming to Johnson City and holding a position there in the national home for disabled soldiers until the year 1920, when the home was taken over as a sanitarium for diseased world war veterans. In this year he left the home, but did not return to the north because of the severe climate, preferring to remain in Johnson City for climatic reasons assigned by him to his relatives in the north.

Upon leaving the soldiers' home he boarded in the home of Flora Ford, who is the mother of an eleven year old child who claims as beneficiary under the will.   He remained in her home until the 4th day of September, 1924, when he moved into a house of his own, recently purchased in Johnson City.

During his stay with Mrs. Ford the record shows that he became greatly attached to Mrs. Ford's little girl, who was kind and affectionate to him and waited on him, and he took her with him about the neighborhood and would buy her candy and toys.   His mail came through the hands of Mrs. Ford and she testified that he received only one letter from his relatives in the north during his stay with her.   He carried on a vigorous correspondence with his relatives up until about the time he went to the home of Mrs. Ford, and when he quit writing the record shows his relatives sent several letters of inquiry addressed to him at Johnson City which were never returned to them, and Mrs. Ford testified that he never received them.

Mr. Russell was seventy-nine years of age at the time of his death. Sometime before his death he had a fall and his leg was injured. This injury never healed but became chronic, and on October the first, twenty-six days after he had moved into his own home, where he lived alone, he had another fall, again injuring his leg, making it necessary that his neighbors carry him into his house.   Gangrene set up and his condition became serious.   He had no one to properly care for him here and Mrs. Ford and an attorney whom he knew and sometimes conferred with, interested themselves in his behalf and

had him transferred to the national sanitarium for disabled war veterans at Johnson City, his then condition making him eligible to re-enter the institution. Upon his admission an examination was had and it is shown that he had gangrene in his wound which had progressed and indicated that he had been so affected for three or more days before his entry into the sanitarium.

He was admitted on the sixth of October, and upon the succeeding day Mrs. Ford and a neighbor, Mrs. Low, went to the sanitarium to see him, and while there they testify that he requested them to return to the city and request Mr. Hughes, his attorney, to come to the sanitarium to see him. They immediately left the sanitarium, called a taxicab and went to the office of Mr. Hughes. They state that they did not know for what purpose Mr. Russell wanted to see Mr. Hughes, but Mr. Hughes' law partner was present, and was used as a witness for the proponent, and he testified that he understood and heard that Mr. Hughes was wanted at the sanitarium for the purpose of executing a will; Mrs. Ford is recalled and denies this, but the witness was the proponent's witness and the proponent is bound by his testimony, and furthermore his testimony is entirely reasonable and supported by the acts of the parties.

The two ladies and Mr. Hughes returned immediately to the hospital and Mr. Hughes entered into a conversation with Mr. Russell, testifying that Mr. Russell talked upon general subjects, asked about the news of the day and expressed a desire for the daily papers. He says his conversation was rational and it is his opinion that Mr. Russell was of sound mind. He then states he asked Mr. Russell if he wanted him to make his will. He had with him yellow note paper and a pencil, and testifies that he took down a rough draft of the will, intending to return to his office and have it typewritten and executed in due form, transferring both his real and personal property to Virgie Ford. He gave as a reason for not carrying out this purpose that he learned that the officials of the sanitarium objected to his presence at the sanitarium and for this reason he did not return. He states that he reduced to writing a purported nuncupative will, on the night of the same day, in typewritten form, which is as follows:

"I was called in by Mr. E. M. Russell, on October 7, 1924, at the hospital in the National Sanitarium where he had been taken for treatment. I went there at his request. After I was there some seven or eight minutes, I asked if he sent for me, to which he repied 'yes, I am a sick man and I want to make some arrangements as to my effects.' I then asked him if he realized his condition, to which he replied yes. I then asked him if he wanted to make a will of his property and effects, if he wished me present as a witness to same, and he said yes. I then

asked him what he desired to do with his property, his money, personal effects and real estate, to which he said: 'I want Virgie to have everything I have got.' I asked him who he meant by Virgie. He said: 'Virgie Ford. I want her to have it; she is my choice among all.' I took this down as he stated it, with pencil, on a tablet, and reduced it to writing on the typewriter when I returned to my office.

Oct. 7, 1924.

A. D. Hughes.''

The memorandum taken at the bedside upon the yellow slips of paper, which, as Mr. Hughes testifies, was in the form of a will, was not accounted for upon the trial, nor called for. Mr. Hughes states that he knew an oral will would not be good as to real property, and for this reason it was his purpose to reduce the will to writing and have it duly executed. He states that the notes were the same as the will introduced and later reduced to writing.

It is indicated in the questions that Mrs. Ford was a beneficiary under the will and an attorney associated with Mr. Hughes and by him, was asked if he did not state that Mrs. Ford was a beneficiary, after some hesitation he denied this, but admitted he had stated that it was their purpose to set up the will as a nuncupative will. Mr. Hughes further testifies that nothing was said by Mr. Russell as to how the will was to be made, only stating that he wanted to make a will and there was nothing said about writing it; but Mr. Hughes has admitted that it was his purpose to write it and the purpose was flustrated for the reason he had heard it rumored he was not wanted at the sanitarium. An unsuccessful attack was made upon the character of Mr. Hughes, and a more successful attack was made upon that of Mrs. Ford, without an attempt to resuscitate her character. The execution of the will is dependent solely upon the testimony of Mrs. Hughes, Mrs. Ford 'and Mrs. Low, proponent's witnesses.

After the introduction of all the evidence a motion was made for a directed verdict by the contestants which was denied; the case was submitted to the jury and it found in favor of the will. A motion was made for a new trial and overruled. Contestants appealed.

The formal issues submitted to the jury and the grounds contained in the motion for a directed verdict are clearly reflected in the assignments of error, and for this reason are omitted from this opinion. The pertinent assignments are two and read:

"There is no evidence to support the verdict of the jury."

"The court erred in not sustaining the motion of the contestants for peremptory instructions made at the close of all the evidence in the case, on the grounds that the alleged nuncupative will was not made in the habitation of the deceased,

nor where he had previously resided ten days at least, nor was he surprised by sickness, on a journey, or from home, as required by the statute; and on the further grounds that there was no evidence to show the animus testandi, the rogatio testium, the intention to nuncupate, or the testamentary capacity of the testator; that the rogatio testium had not been heard or proven by two witnesses as required by law, and that the undisputed evidence showed that Ernest Russell did not possess the testamentary capacity required by law at the time of the alleged nuncupation."

Our statutes in reference to nuncupative wills are codified as follows:

Sec. 3898. "No nuncupative will shall be good, where the estate exceeds two hundred and fifty dollars, unless proved by two disinterested witnesses present at the making thereof; and unless they, or some of them, were especially required to bear witness thereto, by the testator himself; and unless it was made in his last sickness, in his own habitation or dwelling house, or where he had been previously residing ten days at least, except he be surprised by sickness on a journey or from home, and dies without returning to his dwelling.

Sec. 3899. "No nuncupative will shall be proved by the witnesses after six months from the making, unless it were put in writing within ten days; nor shall it be proved till fourteen days after the death of the testator; nor till process has issued to call in the widow or next of kin, or both, if conveniently to be found, to contest it."

This is but the re-enactment of 29 Car. 11, ch. 3, which was the Statute of Frauds. There is no change in the wording except two hundred and fifty dollars is substituted for 30£, two witnesses are substituted for three, and ten days substituted for six. It seems that this re-enactment was necessary because the courts have held that this same statute was not a part of the common law of this State.

Formerly nuncupative wills were in high favor, for the reason that the great majority were unable to read and write and it was often difficult to obtain scriveners to draft wills, but, as learning became more universal, this character of will fell in disfavor and the Statute of Frauds referred to was passed, and since its passage this form of will has almost gone out of use.

Prior to 32 Henry VIII, no will was required to be in writing, by this Act and 34 and 35 H. VIII required all devises of land to be in writing. Nuncupative wills were "practically abolished" in England by the Statute of Frauds, 29 Car. 11, which although not itself in force in the United States, has become the law very generally by enactment. Statute of Wills, Jarman on Wills, Vol. 3, page 755.

It is the policy of this State to construe the provisions of our statute in regard to nuncupative wills rigidly and strictly. It must appear that all requirements of the statute have been complied with. Smith v. Thurman, 2 Heisk., 114.

The making of a nuncupative will is required to be proven by evidence more strict and stringent in every particular than the making of the written will. Tally v. Butterworth, 10 Yerg., 505.

The forms and requirements of the statute must be complied with, and a nuncupative will cannot be made by intention, without such compliance. Ridley v. Coleman, 1 Sneed, 616.

This strictness in proof has been required since the enactment of the English statute by both the English and American courts.

"Nuncupative wills are not favorites with courts of probate, though, if duly proved, they are equally entitled to be pronounced for with written wills. Much more, however, is requisite to the due proof of a nuncupative will than of a written one, in several particulars. In the first place, the provisions of the Statute of Frauds must be strictly complied with to entitle any nuncupative will to probate. Consequently, the absence of due proof of any one of these—that enjoining the rogatio testinum, or calling upon persons to bear witness of the act, for instance (Bennet v. Jackson, 1 Phillim, 191; Parsons v. Miller, ibid. 195)—is fatal at once to a case of this species. But, added to this, and independent of the Statute of Frauds, the factum of a nuncupative will requires to be proved by evidence more strict and stringent than that of a written one, in every single particular. This is requisite in consideration of the facilities with which fraud in setting up nuncupative wills are obviously attended,—facilities which absolutely require to be counteracted by courts insisting on the strictest proof as to the facta of such wills. The testamentary capacity of the deceased, and the animus testandi (testamentary intent) at the time of the alleged nuncupation, must appear by the clearest and most indisputable testimony. Above all, it must plainly result from the evidence that the instrument propounded contains the true substance and import, at least, of the alleged nuncupation and consequently that it embodies the deceased's real testamentary intentions. Lemann v. Bonsall, I Addams, 389."

Applying the statute to the facts of the case:

1. Was the will made "in his last sickness, in his own habitation or dwelling house, or where he had been previously residing ten days at least, except he be surprised by sickness on a journey or from home and dies without returning to his dwelling?" No question is made but that he was in his last sickness, and was not in his own habitation or dwelling house, nor at a place where he resided ten

days at least before making the will, but it is insisted that he was surprised by sickness on a journey or from home. It is ingeniously argued that while he was dangerously ill before he was transferred to the sanitarium, yet he was not aware of the fact until he found himself within the sanitarium, and that this knowledge was a surprise to him and brought his will within the statute. The statute provides in plain language that he must be surprised by sickness. This cannot be said to mean ignorance of his real condition and to broaden the statute and permit the making of a nuncupative will at any time or place by showing that the patient was surprised to learn of his real condition. One who is ill in his home, to an extent justifying his removal to a hospital, should, and ordinarily does, make preparation for setting his affairs in order before his removal; hospitals are not such places where the sick are surrounded by their friends and relatives as is the home and as is contemplated under the statute. There friends and advisers are often not permitted to see the patient under the rules and government of the institution, and the control and influence of physicians and nurses take the place of friends and relatives.

Counsel state that they made diligent search and have found only one case bearing upon this provision in the statute, which is a Virginia case styled Marks v. Briant, (1809) 4 Hen. & Munf., (Va.), 91, wherein it is held that a will made orally away from home, by one who left home feeling unwell but became much worse soon after and died before returning, was valid. Upon reading this case it appears that a young man suffering from a cold and bronchial trouble made a long horseback trip, in the winter, to visit his sister, and soon after arrival was taken worse and died. In construing the Virginia statute, stress was laid upon the fact that the word "surprised" appearing in the English statute had been omitted from the Virginia statute, and for this reason the will was sustained under the facts. It is also said in that case that it was not established that the young man was suffering from his last illness, when he started upon his journey. In the later Virginia case of Nowlin v. Scott, 153, 10 Gratt (Va.), 64, it was held that a party who was at his mill house about one mile from his home was suddenly stricken, and in anticipation of death made his will, but was removed to his home and died soon after from the same illness, that the will was invalid as a nuncupative will.

The purpose of this provision of the statute is to zealously guard the sick against imposition and fraud, and it is assumed that a man in his own habitation will be surrounded by friends and relatives more interested in his physical welfare than in his property, and it is assumed that this is not the natural consequence when a man is away from his home. Certainly a man in a hospital, surrounded and

under the control of a physician, nurses and orderlies who are strictly pursuing a profession does not enjoy the same atmosphere and protection as in the home, when they or others step aside, if they do, and undertake to assist the patient in the disposition of his property. The fraud attempted to be so well guarded by this statute would find ready ingress if hospitals be substituted for homes and a man may there dispose of his personal property, without reference to amount, by word of mouth. We are therefore of the opinion that a person who is suffering from his last illness in his home and from there removed to a hospital is not within the terms of the statute requiring will to be made in his home and is only permitted to make a disposition of his property by formal will duly executed.

2. Was there any evidence to show the animus testandi, the rogatio testium, the intention to nuncupate?

It is clearly shown that the attorney, Mr. Hughes, took notes with the purpose of drafting a written will to transfer both the personal and real estate, and he states the testator made no mention of what character of will he intended to execute. From the undisputed facts it clearly appears that the purpose was to execute a written will, and this purpose was flustrated because the draftsman declined to return to the institution after hearing that he was not wanted there, and as stated by the witness it then became the purpose to set up the will as a nuncupative will.

> "But it is essential that a nuncupative will be merely a verbal declaration of the testator's disposition of his property; therefore a will in writing drawn by an attorney in accordance with instructions given by the testator, and in his last sickness, but not executed, although declared by the testator to be his last will, cannot be admitted to probate as a nuncupative will. In re Hebden's Will, 5 C. E. Gr. (N. J.), 473.

> Request to witnesses.

> "Any statement by him which shows clearly that he is expressing a present intention to give his property by will, and that he desires some one or all of those present to witness his intention, is sufficient. The purpose of the statutory provision is to draw a distinct line of severance between loose and casual statements of a future testamentary intention or instruction for a future written will, uttered in conversation with bystanders, and the testamentary act itself. If the language and the actions of the testator give the witnesses to understand that he is making an oral disposition of his property and that he desires them to bear witness that this is his will, the nuncupative will is valid." 1 Underwood, sec. 169.

T. A. Vol. I—40.

"It must be proved that the deceased, while uttering the words offered as a will, had a present testamentary intention, and that he intended that the very words then uttered, and no others, should constitute his will. If he gives instructions for a will which is subsequently to be drawn up and executed in writing, and it is not done; or if he gives oral directions which are taken down in the form of a will, which he fails to execute as a formal written will because of his death, unconsciousness or delirium coming on before he can do so, the writing cannot be sustained as a nuncupative will. This is now the universal rule, though in England, prior to the statute of Victoria, writings which purported to be wills of personal property were admitted to probate in ecclesiastical courts as valid wills, though not written or signed by the testator. So, also, written instructions for wills were received by these courts and probated, where the testator was prevented by unavoidable accident from executing a formal will." 1 Underwood on Law of Wills, sec. 174.

"Even where all the formalities of a nuncupative will were present, the fact that testator intended to have it reduced to writing in order that it might take effect was held to prevent it from being a valid nuncupative will." Page on Wills, sec. 236.

We are of the opinion there is no proof of a present testamentary intention on the part of the patient at the time the nuncupative will purports to have been made. Every essential element must be established by satisfactory proof, and made by at least two witnesses. In reference to the physical condition of the patient, Mr. Hughes testified that he said: "I am a sick man and I want to make some arrangements as to my effects." Flora Ford states that he said, in the same conversation, the doctor had told him he could not get well and he realized his condition and wanted to dispose of his property, his house and lot, money in bank and personal property.

Mrs. Low says that Mr. Hughes asked him if he realized his condition and he said, "Yes, sir," and he wanted to dispose of his property. It is remarkable that upon this essential question the three witnesses should give three different versions of what was said, and illustrates clearly the danger of depending upon the memory of witnesses to establish an instrument that may so greatly influence the rights and happiness of innocent and absent parties.

It is insisted that the will was made on the seventh of October, 1924, and there is no proof that the witnesses, except Hughes, saw it until the eleventh of April, more than six months after its execution. Under the statute it is not necessary that the witness sign the paper afterwards reduced to writing, if proven within six months, but is seems that to permit a witness to prove the will, even

though written within the time required, if not seen nor signed within the six months, clearly destroys the six months' proviso. The Maryland statute, Acts of 1810, chapter 34, is the same as the Tennessee statute, which is a re-enactment of the Statute of Frauds, and the courts in construing this statute in reference to the question here raised, said:

> "It has been determined that the true construction of the second section of the Act of 1810, chapter 34, in Maryland, requires that the testamentary words, or the substance thereof, should be reduced to writing within six days after they are uttered, and that they should be, within that time, shown to and approved by each of the attesting witnesses." Welling v. Owings, 9 Gill., 467.

We are of the opinion that the nuncupative will, although reduced to writing within the time required, must be seen and approved within the period of six months, or otherwise the witnesses are incompetent to prove the same.

The lower court was in error in sustaining the will for the reasons above given and its judgment will be reversed and a judgment entered here declaring the paper not to be the will of E. M. Russell, deceased; the case will be remanded to the circuit court of Washington county, with direction that the judgment be certified to the county court and there entered, vacating and annulling the instrument as the lawful will of the said Russell. The next friend, Walter Ford, will pay all the costs of the cause.

Snodgrass and Thompson, JJ., concur.